[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
September 12, 2002
THOMAS K. KAHN
CLERK

_____

No. 00-14144

_____

D. C. Docket No. 96-00030-CR-FTM-24D

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DANIEL M. EDGAR,
J. MICHAEL WARD,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(September 12, 2002)**

Before DUBINA and BARKETT, Circuit Judges, and HODGES[*], District Judge.

BARKETT, Circuit Judge:

Defendants-Appellants J. Michael Ward ("Ward") and Daniel M. Edgar ("Edgar"), executive officers at Cape Coral Hospital ("the Hospital"), appeal their convictions and the sentences imposed for crimes arising out of various schemes whereby Ward and Edgar used their positions to illegally convert Hospital funds to their own benefit.  Specifically, Ward appeals his total 87-month concurrent sentences and his conviction for the following: (1) conspiracy to defraud the United States, in violation of 18 U.S.C. § 371 (Count 1); (2) theft from an organization receiving government funds, in violation of 18 U.S.C. § 666 (Counts 2, 4, 23-25, 37 and 51); (3) money laundering, in violation of 18 U.S.C. § 1956(a)(1) (Counts 21 and 53); (4) bank fraud, in violation of 18 U.S.C. § 1344 (Count 26); and (5) tax evasion, in violation of 26 U.S.C. § 7201 (Counts 55-59). Edgar appeals his total 87-month concurrent sentences and his conviction for the following: (1) conspiracy to defraud the United States, in violation of 18 U.S.C. § 371 (Count 1); (2) theft from an organization receiving government funds, in violation of 18 U.S.C. § 666 (Counts 3, 4, and 38); (3) money laundering, in

---

[*]Honorable Wm. Terrell Hodges, U.S. District Judge for the Middle District of Florida, sitting by designation.

violation of 18 U.S.C. § 1956(a)(1) (Counts 5-21 and 54); and (4) tax evasion, in violation of 26 U.S.C. § 7201 (Counts 60-63).

Ward and Edgar present multiple grounds for overturning their convictions and sentences. We have carefully considered these various arguments and have concluded that the district court did not commit reversible error in this case. The parties' arguments regarding the constitutionality of 18 U.S.C. § 666, however, merit some discussion. Edgar argues that 18 U.S.C. § 666 is facially unconstitutional because Congress lacks the power to enact criminal laws under the Spending Clause of the Constitution.[1] Edgar further asserts that if § 666 is void

---

[1]18 U.S.C. § 666, entitled "Theft or bribery concerning programs receiving Federal Funds," provides in pertinent part:

(a)     Whoever, if the circumstance described in subsection (b) of this section exists–
  (1)     being an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof –
    (A)     embezzles, steals, obtains by fraud, or otherwise without authority knowingly converts to use of any person other than the rightful owner or intentionally misapplies, property that –
      (i)     is valued at $5,000 or more, and
      (ii)     is owned by, or is under the care, custody, or control of such organization, government or agency.
. .

. . .
shall be fined under this title, imprisoned not more than 10 years, or both.

(b)     The circumstance referred to in subsection (a) of this section is that the organization, government, or agency receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal

3

due to its constitutional infirmity, then his money laundering convictions cannot stand because the § 666 convictions were the predicate offenses alleged in the money laundering counts. Ward argues that the Indictment was "fatally flawed" because (1) § 666 is unconstitutionally vague; (2) § 666 is unconstitutional as applied because there is no continuing federal interest in the Medicare, Part A funds after their distribution to the Hospital; (3) the Indictment failed to allege that the exception found at § 666(c) was inapplicable; and (4) the Indictment failed to sufficiently allege facts establishing federal jurisdiction under § 666.

## BACKGROUND

Ward served as the Hospital's President and Chief Executive Officer from 1976 through May 1994. Edgar joined the Hospital as Chief Operating Officer in 1978. Through a series of transactions spanning the years 1987 to 1994, Ward and Edgar misappropriated hundreds of thousands of dollars from the hospital for their own benefit. A detailed description of the schemes they carried out, however, is not necessary to the resolution of their constitutional claims. For the purpose of our discussion, the key fact is the hospital's participation in the Medicare, Part A program, which provides federal assistance payments to hospitals and other

---

assistance.

(c)   This section does not apply to bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business.

institutions.[2]  Inasmuch as a slightly more detailed description of the conduct underlying Ward's conviction is required in resolving his contention that the statute is unconstitutionally vague, we set forth additional facts at the appropriate point in our discussion.

## DISCUSSION

In fulfilling its legislative function, Congress may only act pursuant to an express grant of power or authority in Article I of the Constitution.  Courts considering claims involving 18 U.S.C. § 666 have concluded that Congress passed the statute pursuant to its powers under the Spending Clause.  See, e.g., United States v. Zwick, 199 F.3d 672, 687 (3d Cir. 1999); United States v. Santopietro, 166 F.3d 88, 92-94 (2d Cir. 1999); United States v. McCormack, 31 F.Supp.2d 176, 186 n.18 (D. Mass. 1998) (collecting cases); see also United States v. Fischer, 529 U.S. 667, 689 n.3 (2000) (Thomas, J., dissenting); United States v. Suarez, 263 F.3d 468, 487 n.7 (6th Cir. 2001) (Boggs, J., dissenting in part).  The Spending Clause of the Constitution empowers Congress "to lay and collect Taxes,

---

[2]The Hospital received the following Medicare, Part A payments for each of its fiscal years ending June 30, 1987, through June 30, 1994: (1) $19,399,532 for 1987; (2) $18,237,393 for 1988; (3) $20,032,561 for 1989; (4) $22,622,558 for 1990; (5) $25,442,303 for 1991; (6) $29,886,106 for 1992; (7) $35,023,003 for 1993; and (8) $35,796,275 for 1994.  Medicare, Part A payments accounted for approximately forty-five percent of the Hospital's net revenues.  These figures come from the records of Mutual of Omaha, a fiscal intermediary which received funding from the United States to process and pay claims filed by Medicare, Part A beneficiaries.

5

Duties, Imposts, and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." Art. I, § 8, cl. 1.

Edgar argues that Congress has no power to pass criminal laws under the Spending Clause. He maintains that courts have upheld conditional grants of funds to state and local governments on the theory that Congress is not enacting a law binding on those governments, but instead offering a contract which the governments may reject or accept subject to the conditions attached by Congress. It is this contract theory, Edgar asserts, that prevents such congressional actions from upsetting the balance of power between federal and state governments. Edgar contends that § 666, by contrast, is a federal criminal statute designed to punish conduct traditionally within the realm of state concerns, and that such legislative action extends beyond the scope of Congress's powers under the Spending Clause. Accordingly, Edgar contends that the district court should have granted his motion to dismiss the § 666 counts because § 666 is facially unconstitutional. After carefully considering the question, we now hold that § 666 is a valid exercise of Congress's powers under the Spending Clause.

I.     **The Supreme Court's Limiting Construction of § 666 in United States v. Fischer.**

Our conclusion that § 666 is constitutional has as its first point of reference

the Supreme Court's treatment of the statute. The first Supreme Court decision reviewing a § 666 prosecution stated that there was "no serious doubt about the constitutionality" of the statute's anti-bribery provision under the circumstances presented. See Salinas v. United States, 522 U.S. 52, 60 (1997) (citing Westfall v. United States, 274 U.S. 256 (1927)). In Fischer v. United States, 529 U.S. 667 (2000), the Court again upheld a § 666 conviction. The defendant in Fischer was a health care consultant who had been prosecuted under § 666 for fraud and bribery involving a municipal hospital agency which received more than $10,000 in federal funds. At issue was whether payments to the hospital agency under the federal Medicare program constituted "benefits" for purposes of § 666(b), a limiting provision which requires that the alleged offense conduct involve an "organization, government, or agency [that] receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance."

Characterizing Medicare as "a comprehensive federal assistance enterprise aimed at ensuring the availability of quality health care for the broader community," Fischer, 529 U.S. at 680, the Court held that Medicare payments to health care providers count as "benefits" under § 666(b) and not, as the defendant argued, simply as compensation for services rendered. Id. at 676-78. The Court

7

thus upheld the health care consultant's conviction under the statute's

misappropriation and bribery provisions. At the same time, the Court rejected the

government's contention that <u>any</u> funds distributed from federal coffers would

qualify as benefits for purposes of the limitation established by § 666(b). A seven-

judge majority stated:

> Any receipt of federal funds can, at some level of
> generality, be characterized as a benefit. The statute does
> not employ this broad, almost limitless use of the term.
> Doing so would turn almost every act of fraud or bribery
> into a federal offense, upsetting the proper federal
> balance.

<u>Id</u>. at 681.[3] The Court went on to hold that the evaluation of whether particular

federal receipts count as "benefits" turns on the relevant federal "program's

structure, operation, and purpose," as well as the conditions under which an entity

receives federal payments. <u>Id</u>. It reasoned that Medicare payments pass the

requisite threshold, citing as relevant factors the program's comprehensive scheme

of regulation and its broad aim of promoting the long-term stability of health-care

providers.

We are persuaded that the Court's reference to "the proper federal balance"

demonstrates its cognizance of potential constitutional limitations upon the

---

[3]In a dissent joined by Justice Scalia, Justice Thomas likewise read the statute's use of the term "benefits" to require a limiting construction, differing with the majority only as to the test to be applied. <u>See</u> <u>Fischer</u>, 529 U.S. at 690-91 (Thomas, J., dissenting).

application of § 666.  Cf. United States v. Suarez, 263 F.3d 468, 486 (6th Cir. 2001) (Boggs, J., dissenting in part) (remarking that "the Fischer majority's language regarding the need to respect the proper balance between state and federal sovereigns makes clear their constitutional concerns with a broad reading of § 666").  The Court's rejection of the government's proposed construction of the term "benefits," on the basis of the threat it posed the proper federal balance, clearly implied a conclusion as to the soundness of the Court's own alternative construction.  By requiring attention to a program's "structure, operation, and purpose" in determining whether federal monies constitute "benefits," the Court indicated that constitutional concerns implicated by the statute's language may be overcome through careful construction.

In this sense, the Court's approach to § 666 has validated the efforts of the Second and Third Circuits in several pre-Fischer decisions.  Both courts had identified the same constitutional concern addressed by the Court in Fischer: the potential amenability of § 666 to interpretations that would render an exceedingly large class of traditional state offenses subject to federal prosecution.  See United States v. Zwick, 199 F.3d 672, 682-83 (3d Cir. 1999) (noting that "most literal interpretation" of § 666 is "troubling from an interpretative standpoint in that it broadens the range of activity criminalized by the statute and alters the existing

9

balance of federal and state powers"); United States v. Santopietro, 166 F.3d 88, 93 (2d Cir. 1999) (offering, as reductio ad absurdum, the federal prosecution of "a bribe paid to a city's meat inspector . . . just because the city's parks department had received a federal grant of $10,000"). The solution endorsed by both circuits was the recognition of an offense element limiting the statute's application to conduct bearing a sufficient connection to the expenditure of federal funds or the integrity of federal programs. The Supreme Court's decision in Fischer has now confirmed the existence of the constitutional limits suspected by the Second and Third Circuits, while also clarifying that these limits are built into § 666(b)'s requirement that recipient entities receive at least $10,000 in federal "benefits" over the course of a year. After Fischer, it is clear that the term "benefits" encompasses only federal funds expended under sufficiently comprehensive programs. Application of this standard is to be guided by reference to a program's "structure, operation, and purpose," as well as the conditions under which recipient entities receive funds. This discussion of the relevant factors presages a broad enough inquiry to assure that applications of § 666 remain within constitutional bounds.

**II.     Congressional Authority To Enact § 666 As a Necessary and Proper Means of Preserving its Spending Power.**

Although the Fischer majority did not expressly reference any constitutional provision, we are persuaded that a basis for the enactment of § 666 may be found

10

in Congress's authority, under the Necessary and Proper Clause, to protect its capacity to fruitfully exercise the spending power. As a means of ensuring the efficacy of federal appropriations to comprehensive federal assistance programs, the anti-corruption enforcement mechanism strikes us as bearing a sufficient relationship to Congress's spending power to dispel any doubt as to its constitutionality.

Article I of the Constitution gives Congress the authority to "make all Laws which shall be necessary and proper for carrying into Execution" its enumerated powers. Art. I, § 8, cl. 18. From the time of the Supreme Court's landmark decision in McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316 (1819), it has been recognized that the Necessary and Proper Clause authorizes Congress, subject to other constraints imposed by the Constitution, to adopt measures that bear a rational connection to any of its enumerated powers. Therefore, § 666 may be upheld if the availability of federal criminal jurisdiction over the specified offense conduct bears a reasonable relationship to exercise of the Congressional spending power.

In Fischer, the Supreme Court's analysis at times bears inflections of this mode of analysis. The Court noted that "the language of subsection (b) reveals Congress' expansive, unambiguous intent to ensure the integrity of organizations

11

participating in federal assistance programs." Fischer, 529 U.S. at 678. This reference to ensuring integrity, as well as the identification of plural federal assistance programs, suggests a reading of § 666 as serving a Congressional meta-purpose: the creation of an enforcement mechanism sufficient to assure that disbursements meeting the § 666(b) threshold are in fact applied in furtherance of the purposes for which they are dispensed.

Further support for our reliance upon the Necessary and Proper Clause may be found in United States v. Lipscomb, No. 00-10461, 2002 WL 1539805 (5th Cir. July 12, 2002), despite the failure of a fractured panel in that case to resolve an as-applied challenge to § 666's constitutionality. Shifting majorities of the Lipscomb panel contributed to a judgment reversing a former Dallas City Council member's conviction under § 666 for accepting bribes from a taxicab company. This judgment, however, did not depend on any conclusion as to § 666's constitutionality. Rather, each of the two opinions addressing the defendant's constitutional challenge appears to have viewed the enactment of § 666 as within Congress's powers under the Necessary and Proper Clause. In one of the three opinions entered in the case, Judge Wiener applied a necessary-and-proper analysis as one ground on which the statute and the defendant's prosecution could be upheld. Judge Wiener found the rational connection standard satisfied by two

federal interests in criminal jurisdiction over corruption of the kind at bar. First was the absolute size of federal funds – $56 million – received by the city of Dallas. Lipscomb, 2002 WL 1539805, at *22. Second was the "integrity *vel non* of federal programs and funds," id. at *23, by which Judge Wiener meant Congress's interest in ensuring "the honesty of state and local officials who have federal funds in their purview or federal programs under their authority." Id.

In a separate opinion, Judge Smith outlined his opposing view that § 666 was unconstitutional as applied through the prosecution of the former council member's corrupt activities. Judge Smith's opinion nonetheless suggested that the Necessary and Proper Clause affords a sufficient basis for Congress's enactment of § 666. Distinguishing the "federal interest in federally-funded programs" from the "federal government's generalized interest in everything that occurs within its borders," Lipscomb, 2002 WL 1539805 at *56, he reasoned that policing a taxicab company's bribery of a local legislator is "necessary and proper" only to the pursuit of the latter, generalized interest, and thus exceeds the bounds of Congress's Article I powers. Judge Smith therefore appears to have presumed that § 666 is necessary and proper inasmuch as it may be applied to safeguard substantial amounts of federal funding disbursed in connection with reasonably comprehensive federal assistance programs.

13

The opinions of both Judge Wiener and Judge Smith thus support our view that the Necessary and Proper Clause provides Congress with the requisite authority to enact § 666, even if some prosecutions under the statute may require reversal. Indeed, for Congress to exercise its spending power effectively, it must be assured that the instrumentalities through which the federal government pursues comprehensive aims can be trusted to apply appropriated funds toward their intended objectives. The legislative history of § 666 provides evidence of exactly such an intent. According to a Senate Report accompanying the statute, the purpose of the law is "to create new offenses to augment the ability of the United States to vindicate significant acts of theft, fraud, and bribery involving Federal monies that are disbursed to private organizations or State and local governments pursuant to a Federal program." S. Rep. No. 225, 98th Cong., 2d Sess. 369-70 (1984). The report also states that "the Federal Government clearly retains a strong interest in assuring the integrity of . . . program funds." Id.

These statements indicate that through § 666, Congress sought to establish a safeguard to assure that federal benefits would be used for their intended purposes. § 666 provides such assurance by authorizing the federal prosecution of individuals who corrupt entities which receive (1) more than $10,000 in federal funds (2) in connection with programs defined by a sufficiently comprehensive "structure,

14

operation, and purpose" to merit characterization of the funds as benefits under § 666(b). Fischer, 529 U.S. at 681. It is reasonable for Congress to conclude that any corruption of such recipient organizations, regardless of whether the corruption involves the misappropriation of specifically federal funds, endangers the comprehensive programs in which the organizations participate, and thus the effective exercise of the Congressional spending power as well.

Accordingly, we reject Edgar's facial challenge to the constitutionality of § 666 and find that the district court did not abuse its discretion in denying Edgar's motion to dismiss on this ground. Moreover, since Edgar has not demonstrated any constitutional infirmity in the enactment of § 666, the money-laundering convictions premised on his § 666 offenses must also stand.

## III. Section 666 is Not Unconstitutionally Vague.

Ward raises two additional constitutional challenges to his conviction under § 666. The first focuses on an exception set forth in § 666(c), which precludes prosecution of alleged offense conduct involving only "bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business." Ward argues that § 666 is unconstitutionally vague because the phrase "usual course of business" is subject to two meanings: (1) the usual course of business of other businesses in an industry, or (2) the usual course of

business of the entity at issue in a particular case. The district court concluded that this argument was meritless. We agree.

Absent a First Amendment claim, vagueness challenges must be evaluated in light of the facts of the individual case before the court; in other words, the statute is judged on an "as applied" basis. Maynard v. Cartwright, 486 U.S. 356, 361 (1988). Because "objections to vagueness under the Due Process Clause rest on the lack of notice," an as-applied vagueness challenge "may be overcome in any specific case where reasonable persons would know that their conduct is at risk." Id.

We agree with the district court's characterization of Ward's claim as "meritless" because any reasonable person would understand that the phrase "usual course of business" in § 666(c) would not bar prosecution for the conduct alleged in the § 666 counts in the Indictment. Among the transactions for which Ward was convicted were the following: converting hospital monies into unauthorized bonuses to himself; profiting from the Hospital's use of a warehouse that he, Edgar, and another officer in effect sold to the Hospital on two separate occasions; participating in the diversion of Hospital funds to himself and others through the use of fictional invoices; collecting a finder's fee from the Hospital in connection with an investment of the Hospital's parent company; using Hospital monies to pay

16

premiums on insurance policies for which he was solely responsible; and profiting from the Hospital's purchase, at an inflated price, of a real estate option from a partnership in which he held an undisclosed interest. Any reasonable person would understand that the funds involved in these transactions could not be construed as lawful payments or reimbursements made in the "usual course of business." Moreover, under the "as applied" standard, the meaning of "usual course of business" must be viewed in light of Ward's knowledge and experience as a hospital president, CEO, and member of the Board of Directors. Surely Ward knew on the basis of this experience that neither Cape Coral nor any other hospital would permit a few of its executives to convert enormous sums of money for their personal benefit as part of the hospital's "usual course of business."

Because we agree with the district court that Ward's vagueness challenge is meritless, we conclude that the district court did not abuse its discretion in denying Ward's motion to dismiss on that ground.

IV. **Section 666 is Not Unconstitutional As Applied.**

Ward also argues that the § 666 counts should have been dismissed because the absence of a <u>continuing</u> federal interest in the Medicare, Part A funds after their distribution to the Hospital makes his prosecution under § 666 unconstitutional. On Ward's view, § 666 requires the Government to prove that misappropriated

funds themselves came either from a federal source or from a pool including federal funds committed to a specific federal purpose. Ward contends that no such federal purpose guided the use of funds he misappropriated because these monies were reimbursement to the hospital for its prior treatment of Medicare patients. Since the patients had already been treated, he maintains, it should be recognized that such funds lost "their federal character" upon disbursement to the hospital as compensation for the completed services. Ward Brief at 20.

As a matter of statutory interpretation, the Supreme Court's decision in Fischer forecloses Ward's argument. In Fischer, the Court reasoned that payments disbursed as reimbursement for the treatment of Medicare patients "are made not simply to reimburse for treatment of qualifying patients but to assist the hospital in making available and maintaining a certain level and quality of medical care, all in the interest of both the hospital and the greater community." Fischer, 529 U.S. at 679-80. Hence the payments may be reimbursement, but they do more than compensate for services already provided – they sustain health care providers in their future operations and thereby ensure the continued availability of medical care for persons covered by the Medicare program. This broader purpose shows the federal government to have a continuing interest in the sound administration of Medicare reimbursement funds, long after any particular patient's course of

18

treatment is completed.[4]

Since Ward challenges the constitutionality of the statute's application to his conduct, however, his argument ultimately rests on the assertion that this identification of a continuing federal interest in reimbursement funds extends the reach of § 666 beyond the limits of Congress's spending power.  As discussed earlier in this opinion, however, this argument was implicitly rejected by the Supreme Court in Fischer.  There, the Supreme Court held that the corruption of health care providers participating in the federal Medicare program affords a sufficient basis for prosecution under § 666.  The Supreme Court adopted this construction of the statute even as it manifested a cognizance of constitutional limits in remarking that alternative interpretations could upset the "proper federal balance."  Fischer, 529 U.S. at 681.  The Court's decision not to further probe the limits of permissible construction only indicates that Medicare-related prosecutions under § 666 remain well removed from the relevant constitutional boundaries.  Cf. id. at 682 ("Other cases may present questions requiring further examination and elaboration of the term 'benefits.'").  Whatever further elucidation may be required

---

[4]We reject Ward's effort to distinguish the Fischer case on the ground that it did not explicitly identify the funds in question as Medicare, Part A funds, the only type of payments at issue in this case.  The Medicare program's bifurcation into a Part A and a Part B is irrelevant for our present purpose of determining whether a continuing federal interest exists in funds paid health care providers as reimbursement for services rendered.

to identify the point at which § 666's application will transgress the outer boundary of Congress's spending power, <u>Fischer</u> clearly vindicated § 666's constitutionality as applied to the defrauding of entities funded under Medicare.

We therefore agree with the district court that the government could constitutionally prosecute Ward under § 666, and hold that the district court did not abuse its discretion in denying Ward's motion to dismiss on this ground. <u>See</u> <u>Pielago</u>, 135 F.3d at 707. Viewing all facts and inferences in favor of the government, we also find that the government adduced sufficient evidence of a "federal interest" in the stolen funds to merit submitting the § 666 charges to the jury. <u>See</u> Rule Crim. Proc. 29. Accordingly, we conclude that the district court did not err in denying Ward's motion for judgment of acquittal. <u>See</u> <u>Hansen</u>, 262 F.3d at 1236 (upholding denial of Rule 29 requires only a determination that "a reasonable fact-finder could conclude that the evidence established the defendant's guilt beyond a reasonable doubt.").

Because we conclude there is no merit to any of the arguments Edgar and Ward make in this appeal, we affirm their convictions.

AFFIRMED.